# UNITED STATES DISTRICT COURT

### for the
### Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>15300 FORK STREET,<br>LAUREL HILL, NC, 28351 | )<br>)<br>)<br>)<br>)<br>)    Case No. 1:23MJ234-1 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____, there is now concealed *(identify the person or describe the property to be **seized**)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(a)(1)(A), 922 (g), 922(o) | Manufacturing and Dealing Firearms Without a License, Possessing a Firearm as a Felon, Possessing a Machinegun |
| 26 U.S.C. §§ 5861(d), 5861(f) | Making and/or Possessing a Firearm (Machinegun) in violation of the NFA |

The application is based on these facts:

See Attached Affidavit of Special Agent Austin B. Warren

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Austin B. Warren
*Applicant's signature*

_____
Austin B. Warren, Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 06/06/2023   2:39 pm _____

_____
*Judge's signature*

City and state:   Durham, North Carolina

Joe L. Webster, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Austin B. Warren, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 15300 Fork Street, Laurel Hill, North Carolina, 28351, (TARGET PREMISES), as more particularly described in Attachment A, and the person of Kevin Ray FRIER (Date of Birth: 09/13/1999), for the things described in Attachment B.

2.      I am a "federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal rules of Criminal Procedure.  I am engaged in enforcing federal criminal laws and am authorized by the Attorney General to request a search warrant, among other things.

3.      I have been employed as a SA with the ATF since January 2021. I am currently assigned to the Fayetteville, North Carolina Resident Agency whose primarily responsibilities include investigating groups or individuals who commit violations of federal firearm, arson, explosive, and narcotics laws. During my tenure with the ATF, I have assisted in the execution of search warrants that have resulted in the seizure of firearms, controlled substances, controlled substance proceeds, cellphone, documentation, surveillance systems, social media account information, GPS tracking data, etc.

1

4.      Prior to working for ATF, I graduated from Methodist University in May 2016 with a Bachelor of Science in Applied Forensic Science. I was employed as a Special Agent with the North Carolina State Bureau of Investigation (NC SBI) from January 2017 until January 2021. During my time as a Special Agent with the NC SBI, I investigated a variety of violations of state law including: embezzlement, homicide, arson, explosions, public corruption, threats against public/educational facilities, and narcotic offenses. I also conducted officer involved shooting investigations within my area of responsibility. I have received various training including the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, the Special Agent Basic Training Program at the ATF National Academy, North Carolina Basic Law Enforcement Training, the North Carolina State Bureau of Investigation Special Agent Training Academy, and North Carolina Police Law Institute. The aforementioned training included formal training in affidavit and search warrant preparation as well as formal education in federal firearms laws.

5.      During the course of my employment with ATF, I have been personally involved, or assisted other agents, in a number of firearm investigations, including violations of the Gun Control Act (GCA) and National Firearms Act (NFA). My training and experience in the investigation of the illegal use or possession of firearms has provided me with information concerning the normal patterns and procedures through which individuals acquire, store, maintain, and/or manufacture firearms. I have experience and have assisted other agents who have expertise in conducting investigations related to individuals who unlawfully purchase and traffic firearms. As a result of my own personal experiences, the training I have received, and

2

the information that I have obtained from working with other ATF agents, I am familiar with violations of Federal Firearms Laws.

6. I am currently investigating Kevin Ray FRIER (Date of Birth: 09/13/1999) for offenses involving firearms, to include violations of Title 18, United States Code, Section 922(a)(1)(A) - Manufacturing and Dealing Firearms Without a License; Title 18, United States Code, Section 922(o) – Possession of a Machinegun; Title 26, United States Code, Section 5861(d) and (f) – Making and/or Possessing a Firearm(s) (machineguns) in violation of the NFA, and Title 18, United States Code, Section 922(g)(1) – Felon in Possession of a Firearm (TARGET OFFENSES).

7. Based on the facts set forth in this affidavit, there is probable cause to believe violations of the TARGET OFFENSES have been committed by FRIER, and that evidence, instrumentalities, and/or fruits of these violations is located inside the TARGET PREMISES.

8. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of presenting probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause in order to obtain a search warrant for the PREMISES, further described in Attachment A, and FRIER (Date of Birth: 09/13/1999) for the items described in Attachment B. As set forth herein, the PREMISES is being utilized by FRIER to manufacture and distribute unserialized 3-D printed privately made firearms (PMF), 3D printed auto sears for Glocks and

3

AR-15s, and machineguns. This residence is also the primary residence of Kevin Ray FRIER and is located in the Middle District of North Carolina.

## APPLICABLE LAW & DEFINITIONS

### Unlawful Manufacture And Dealing Of Firearms

9.      Title 18, United States Code, Section 922(a)(1)(A) provides: "(a) It shall be unlawful -- (1) for any person-- (A) except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce."

10.     Title 18, United States Code, Section 921(a)(3) defines a "firearm" as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon . . . ."

11.     Title 18, United States Code, Section 921(a)(10) defines a "manufacturer" in pertinent part as "any person engaged in the business of manufacturing firearms or ammunition for the purposes of sale or distribution."

12.     Title 18, United States Code, Section 921(a)(11) defines a "dealer" in pertinent part as "any person engaged in the business of selling firearms at wholesale or retail . . . ." The term "engaged in the business" is further defined as follows: a "manufacturer" as "a person who devotes time attention and labor to manufacturing as a regular course of trade or business with

4

the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured." 18 U.S.C. § 921(a)(21)(A).

13.     Title 18, United States Code, Section 921(a)(21)(C) defines a "dealer" as "a person who devotes time, attention and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."

**Illegal Possession of Machineguns: 18 U.S.C. § 922(o)**

14.     Title 18, United States Code, Section 922(o) prohibits the transfer or possession of a machinegun as follows: (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun. (2) This subsection does not apply with respect to (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

15.     Title 18, United States Code, Section 921(a)(23) incorporates the definition of a machinegun in 26 U.S.C. § 5845(b): "The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))."

16.     Title 26, United States Code, Section 5845(b) defines "machinegun" as follows: The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single

5

function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

### Possession of an Unregistered NFA Weapon: 26 U.S.C. § 5861(d)

17.     Title 26, United States Code, Section 5861(d) states: "It shall be unlawful for any person -- (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." Title 26, United States Code, Section 5845(a)(6)-(7) provides: "For the purpose of this chapter-- (a) Firearm.--The term "firearm" means . . . (6) a machinegun.

### Felon in Possession of a Firearm: 18 U.S.C. § 922 (g)(1)

18.     Title 18, United States Code, Section 922(g) prohibits any person (1) who has been convicted in any court, of a crime punishable for a term exceeding one year; to ship or transport in interstate or foreign commerce, or in possess in or affecting commerce, any firearm or ammunition; or to receive and firearm or ammunition which has been shipped or transported in interstate of foreign commerce.

### Glock Conversion Devices

19.     Based upon my training and experience, I am aware of conversion devices that have been designed and created for the sole purpose of converting semiautomatic Glock pistols into fully automatic machineguns. These devices vary by design and appearance but all, when properly installed on a semi-automatic Glock pistol, will allow the firearm to expel more than

one projectile by a single pull of the trigger at approximately 1,200 rounds per minute. Installation of these conversion devices is fast and simple, requires no technical expertise, and is completed by removing the polymer slide cover plate on a Glock semi-automatic pistol and replacing it with a conversion device. I also know that these devices are referred to by different names, including but not limited to switches, auto sears, convertors, conversion switches, selector switches, conversion devices, fun switches, and Fire Selector Systems for Glock ("FSSGs"). I know that ATF considers Glock conversion devices as post-May 19, 1986, machineguns. Therefore, apart from official military and law enforcement use, Glock conversion devices may only be lawfully possessed by properly licensed FFLs who have paid the appropriate Special Occupational Tax ("SOT") required of individuals manufacturing, importing, or dealing in NFA weapons, including machineguns.

### Auto Sears and Selector Switches

20.     The ATF has examined a part, commonly known as an "auto sear" and identified by various trade names, including "AR 15 auto sear," "drop in auto sear," and "auto sear II" (the "Auto Sear"). The ATF has found that the addition of the Auto Sear to certain AR15 type semiautomatic rifles, manufactured with M16 internal components already installed, will convert such rifles to machineguns by enabling the firearm to shoot automatically more than one shot, without manual loading, by a single function of the trigger. Thus, the Auto Sear is "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun" and, consequently, constitutes a machinegun as defined by 26 U.S.C. § 5845(b). *See* 27 C.F.R. § 179.11.

7

21.     A "selector switch" is an item used to switch between semiautomatic and automatic fire.  The selector switch itself is only a firearm part and not considered a machinegun.

### Use Of "80% Receivers" To Manufacture Firearms

22.     In firearms terminology, the "receiver" is the part of a firearm that houses the operating parts. There are many types and styles of firearm receivers. The term "80% receiver" is industry vernacular that refers to an unfinished firearm that has not yet reached the point in the manufacturing process where it should be classified as a "firearm" as defined by 18 U.S.C. § 922(a)(3). The unfinished receivers are usually fabricated to a point where minimal work needs to be completed by the purchaser in order to convert it into a "firearm."  Since "80% receivers" do not meet definition of a firearm, they are not subject to the same requirements to purchase, transfer, or possess. "80% receivers" can be purchased by anyone, including prohibited persons, such as persons previously convicted of a crime punishable by more than one year in prison, and are often purchased through the Internet with no record keeping requirements.

23.     There are several methods to "manufacture" the unfinished receiver into a firearm.  Some of these methods involve milling out or drilling the unfinished receiver. This can be accomplished by using different types of tools or machines such as a drill press, a milling machine, rotary tool such as a Dremel, or a computer numerical control ("CNC") milling machine amongst others. CNC milling is a machining process that uses computerized controls and rotary cutting tools to progressively remove material from the working item, resulting in custom-designed part or product.  The process of drilling out or milling out the unfinished receiver generally creates metal shavings on or around the used equipment. Often, the unfinished receiver will come with a template to guide where milling or drilling must occur in order to

8

complete the firearm. Once the receiver has been completed, it is usually affixed with other firearms parts and accessories that constitute a firearm under federal law. There are numerous parts and accessories that can be added to the receiver, such as barrels, stocks and triggers. These individual parts and accessories can also be purchased by any individual, including prohibited persons.

## PROBABLE CAUSE

24.     In June of 2022, ATF Task Force Officer (TFO) Zac Van Horn received information from the ATF Internet Investigations Center (IIC) who was contacted by an ATF Special Agent (SA) from the field regarding an unknown individual advertising the sale of Glock switches on his YouTube channel (Xbox: Attachments – https://www.youtube.com/channel/UCumyfG9_mbCf5zJ5s6PMJ4w). Within the YouTube short videos, the unknown user advertises the Instagram account @910kev. From there, the IIC was able to locate additional social media profiles to help locate and identify the individual, Kevin Ray FRIER, DOB: September 13, 1999, address of 15300 Fork Street, Laurel Hill, North Carolina, 28351 (TARGET PREMISES[1]).[2]

25.     A criminal history query revealed FRIER has a 2017 felony conviction in Scotland County, North Carolina for making a false bomb threat to a public building (Case No.

---

[1] According to Scotland County tax records and GIS, the residence and property are registered to Jerry Johnson and Darlene Johnson.

[2] North Carolina Department of Motor Vehicles lists a North Carolina Driver's License in the name of Kevin Frier, numbered 44215490, with a date of birth of 09/13/1999 and a home address as the TARGET PREMISES.

9

14CRS52330). He was sentenced to 5 to 15 months' imprisonment, but that was suspended and Frier was placed on 36 months of supervised probation. In the Plea Adjudication and Plea Transcript, Frier acknowledged that he understood he was pleading guilty to a Class H felony for which the maximum penalty was 39 months.

## Facebook and Instagram Review

26.     On August 09, 2022, ATF SA C. Basgall was granted a search warrant on FRIER's Facebook and Instagram Account by the Honorable United States Magistrate Judge Joi E. Peake of the Middle District of North Carolina and executed the search warrant the same day on Meta Platforms, Inc.

27.     On May 3, 2023, ATF SA Basgall finished conducting a review of the contents of a Facebook account attributed to FRIER. The contents of the account were obtained from Meta Platforms Inc., pursuant to a federal search warrant executed on August 9, 2022. What follows is a brief summary of the contents of FRIER'S Facebook account.

28.     Throughout her review of the contents of FRIER's Facebook account (100079301172745), ATF SA Basgall observed FRIER contact multiple individuals via Facebook Messenger regarding the sale of "Glock Switch" devices. A "Glock Switch" is a device that, when affixed to the rear of a Glock pistol, converts the pistol from semiautomatic fire to fully automatic fire. Similar such devices have been previously ruled as machineguns by ATF'S Firearms and Ammunition Technology Division (FATD).

29.    Throughout the messages to and from FRIER regarding the sale of "Glock Switch" devices and additional firearms, FRIER provided purchasers with the Cash App[3] account of "$Rebom0" in order for him to collect payment outside of a cash transaction.

30.    The contents of the Facebook account included photographs and videos previously viewed by ATF SA Basgall from FRIER's public Facebook profile where he advertised "Glock Switch" devices for sale at various prices.

31.    ATF SA Basgall observed that FRIER utilized the email "frierk00@gmail.com" to create the Facebook account on "2022-03-15 20:31:06 UTC." When creating this account, FRIER entered Laurel Hill, North Carolina as the city associated with the account.

32.    The contents also contained the date of birth FRIER provided in order to establish the account as "09/13/1999."

33.    The Facebook account is also listed as "in a relationship" with Facebook account "Kayla Jones" (100000660938581).

34.    Through Facebook Messenger, FRIER appears to set up multiple purchases of "Glock Switch" devices with various individuals. After one such instance, in a message time stamped "2022-07-17 23:49:47 UTC" FRIER asks Facebook account "Pun Edwards" (100053499951068) "Did Bro try them out" after appearing to set up a purchase on July 15-16, 2022.

_____

[3] Cash App is a cellphone application and service that allows individuals to transfer money digitally from one user to another.

11

35.	Additionally, FRIER also offers firearms he has assembled, or 3D printed[4] for sale via his posts to Facebook and through Facebook Messenger. In a Facebook Messenger chat with Facebook Account "Emu Shots" (100010980078513), FRIER sends multiple photographs, shown below, of various firearms he offers to sell between the dates of April 10, 2022, to July 18, 2022.



36.



37.

---

[4] 3D printing, also known as additive manufacturing, is the construction of a three-dimensional object from a CAD model or a digital 3D model. It can be done using a variety of processes in which material is deposited, joined, or solidified under computer control, with material being added together (such as plastics, liquids, or powder grains being fused), typically layer by layer.

12



38.

39.     In a message timestamped "2022-07-15 18:39:56 UTC" the "Emu Shots" Facebook account askes to "buy da glock" in reference to the first photograph above of a black pistol with a blue slide. Through a series of messages FRIER and "Emu Shots" negotiate the price of the firearm to eventually be "…520 and 6 grams" or $520 and 6 grams of a controlled substance.

40.     Following a series of messages regarding when FRIER will be at home to conduct the purchase, FRIER sends a message timestamped "2022-07-15 23:08:29" stating "Be safe bro" followed by the Messages "That's my bby u got lmao" and "I made it w love" timestamped "2022-07-15 23:08:44 UTC" and "2022-07-15 23:08:51" respectively.

41.     In a message timestamped "2022-07-16 03:09:26 UTC" the "Emu Shots" sends FRIER a video of himself and an unidentified female shooting the firearm. (Video 723140518993830)

42.     In a Facebook Message to Facebook account "Kayla Jones", the same account FRIER's account is listed as in a relationship with, timestamped "2022-04-05 15:09:36 UTC," FRIER sends the photograph below of his Ender brand 3D printer.

13



43.

44.     Throughout the contents of FRIER'S Facebook account, he advised multiple

individuals that he 3D prints the "Glock Switch" devices himself with the above pictured 3D

printer. FRIER also mentions to multiple other individuals that he has begun 3D printing

additional firearms frames and receivers with the 3D printer pictured above.

45.     In a message timestamped "2022-07-29 18:47:16 UTC," FRIER sends the "Kayla

Jones" Facebook account a photograph of an "Extractor Plunger Assembly" receipt from "Ghost

Inc. Triggers and Accessories" addressed to "Kevin Frier, 15300 Fork Street, Laurel Hill, NC

28351" (the PREMISES) (pictured below).



46.

14

47.     In another group chat with the same "Kayla Jones" Facebook account and a "Summer Danielle" (100005677424281), FRIER sends a photograph, shown below, time stamped "2022-06-29 20:38:49 UTC" which contains another receipt for firearms parts and accessories addressed to "Kevin frier, 15300 FORK ST, LAUREL HILL, NC 28351" (the PREMISES).



48.

49.     FRIER also sends photographs of firearms parts he claims to have purchased online to Facebook Account "Brandon and Amber Morton" (100000306009190). Two such

15

photographs, timestamped "2022-07-13 18:08:04 UTC" and "2022-07-13 18:08:06 UTC" respectively are pictured below.



50.

51. In addition to the photographs of "Glock Switch" devices, FRIER also sends the video previously obtained by ATF SA Basgall of him shooting a pistol with a "Glock Switch" device affixed to the rear of the firearms to multiple individuals he attempts to sell the devices to. FRIER typically sends the video after the individual attempting to purchase the device expresses skepticism regarding the functionality of the "Glock Switches."

52. The forgoing is intended to be a broad overview of the contents of the Facebook account and not a verbatim transcription of every comment, post, message, etc. contained within the data provided by Meta Platforms Inc.

53. On May 3, 2023, ATF SA Basgall finished conducting a review of the contents of Instagram Account "910kev," an account attributed to FRIER. The contents of the account were obtained from Meta Platforms Inc., pursuant to the federal search warrant executed on August 9, 2022. What follows is a brief summary of the contents of FRIER'S Instagram account.

16

54.     Throughout her review of the contents of FRIER'S Instagram account, ATF SA Basgall observed FRIER contact multiple individuals via Instagram Messenger regarding the sale of "Glock Switch" devices.

55.     The contents of the Instagram account included photographs and videos previously viewed by SA Basgall from FRIER's public Instagram profile where he advertised Glock "switch" devices for sale at various prices.

56.     ATF SA Basgall observed that FRIER utilized the email frierfrier@gmail.com to create the Instagram account on "2019-09-20 20:26:12 UTC."

57.     SA Basgall also observed the following photo posted to FRIER's account advertising "Glock Switch" devices for sale at $50 each, with the timestamp of "2022-05-20 05:17:30 UTC" and the comment "HMU" or "Hit me up."



58.

59.     ATF SA Basgall also observed the following photo posted to FRIER'S account advertising Glock "switch" devices for sale at $120 each, with the timestamp of "2022-05-15 18:30:33 UTC," once again posted with the comment "Hmu."

17



60.

61.    In response to these posts, many individuals privately messaged FRIER through Instagram direct messages inquiring the cost of the "Glock Switch" devices and if FRIER still had any for sale. These inquires happened from multiple accounts offering cash and asking for other methods of payment in order to purchase the "Glock Switch" devices from FRIER. When FRIER was asked for an additional form of payment, he provided the purchaser with the Cash App account of "$Rebom0." When the purchaser has issues paying the "$Rebom0" account, FRIER provides them with an alternative account "$kaybae0815." The name attached to the "$kaybae0815" Cash App account is "Kayla Jones," as evidenced by the following photograph sent by the Instagram account "hennyyhandsome" to FRIER time stamped "2022-06-18 05:46:29 UTC" :



62.

63.    The above photograph was sent to FRIER as a confirmation by the Instagram account "hennyyhandsome" that he/she had paid FRIER in exchange for FRIER sharing his

18

method of ordering "Glock Switch" devices off the internet. Following FRIER receiving the message from "hennyyhandsome," he asks for an email to send template files to the account owner. The owner of "hennyyhandsome" provides the email Adriangonzales615@gmail.com to FRIER.

64.     FRIER then advised the "hennyyhandsome" account to take the two template files he emailed him/her and upload them to the website "shapeways.com," a 3D printing conglomerate site. FRIER advised "hennyyhandsome" they can order the templates printed a number of times in either plastic or metal from the website and the company will ship the finished product.

65.     FRIER appears to have used this method to manufacture "Glock Switch" devices and then to have had the company ship the finished product directly to the individuals who requested to purchase the items from him. FRIER typically would request the address the individual would like the "Glock Switch" device shipped to and would send them a photograph to confirm the address, like the following photograph time stamped "2022-04-27 17:19:22 UTC" and sent to Instagram Account "free_lilbill6."



66.

67.     Later, in a message time stamped "2022-06-30 01:38:56 UTC,"
"hennyyhandsome" messages FRIER the photograph below of an email from Shape Ways
detailing that they took the design ordered out of production because the company "does not
produce guns accessories, realistic gun replicas or gun games."



68.

69.     FRIER appears to set up several purchases in which he ships the "Glock Switch"
devices to individuals. This is exhibited by the account "antoino_099" sending the message "The
feds or atf or anything not going to open or see my package or pull up on my bro ??"
timestamped "2022-07-28 20:02:14 UTC." FRIER then assures the "antoino_099" account
holder that he can ship the devices securely. In a message time stamped "2022-07-29 16:24:57
UTC" the "antoino_099" account sends FRIER a message identifying himself and the address he
wants the "Glock Switch" sent to as "Ramon bravo 13905 E 33rd pl Tulsa Oklahoma 74134
united state." "antoino_099" then provides the phone number of "(918) 645-6597" to FRIER.

70.     In a message timestamped "2022-07-02 03:57:22 UTC," after claiming to have a "Draco" and "300 blk" FRIER sends the following photograph to Instagram account "osammabinloaded":



71.

72.     FRIER then advises "osammabinloaded" the attachment on the end of the AK-47 style pistol is a "Grenade/tear gas" launcher.

73.     Within the Instagram contents, FRIER also references his prohibited status to Instagram account "userislost299" in a message time stamped "2022-04-29 21:40:11 UTC" where he states: "I cant have them I just buy my dad n mom them n homeboys."

74.     FRIER also messages individuals on Instagram regarding him 3D printing firearms other than "Glock Switch" devices. In a message timestamped "2022-06-14 17:48:03 UTC," FRIER sends the photograph below of what appears to be a 3D printed firearms to Instagram account "d.k.v.01."

75.　

76.　In a message timestamped "2022-06-14 17:49:21 UTC," FRIER advised

"d.k.v.01" regarding the above firearm: "It lasted the 3 shots rn." FRIER then advised "d.k.v.01"

the firearm would last longer as long as it was not shot repeatedly because it would warp the

frame. Additionally, FRIER advised "d.k.v.01" that the trigger pull on the firearm was

excessively heavy, stating in a message time stamped "2022-06-14 17:49:58 UTC" that "The

trigger pull is like 20 pounds lmao."

77.　ATF SA Basgall observed, throughout the Instagram Contents, that FRIER also

sent various photographs of receipts, online shopping carts, and online checkout screens to

multiple accounts. Nearly all of the aforementioned photographs were attributed to online

checkouts, online shopping carts, and digital receipts from various firearms parts companies and

Federal Firearms Licensees. For example, FRIER sent the following photograph, time stamped

"2022-07-06 14:33:20 UTC," of him going through an online checkout from "rockeybrass.com"

with a Polymer 80 Glock 19 Pistol Frame Kit to the Instagram account "d.k.v.01."

22



78.

79.     FRIER followed the above photograph with the photograph below, time stamped "2022-07-21 19:49:53 UTC," of the Polymer 80 Pistol Frame Kit.



80.

81.     The forgoing is intended to be a broad overview of the contents of the Instagram account and not a verbatim transcription of every comment, post, message, etc. contained within the data provided by Meta Platforms Inc.

### **Controlled Purchase: #1 (Unregistered Machineguns)**

82.     On August 8, 2022, ATF TFO Van Horn along with the Laurinburg Police Department (LPD) Gang and Narcotics Unit and other law enforcement personnel utilized a Confidential Informant (CI #1) to conduct a controlled purchase of two Glock "switches" from FRIER at the TARGET PREMISES.

23

83.     Law enforcement personnel met at a predetermined meet location (PML) to conduct a briefing. Once the briefing was concluded, CI #1 and CI #1's vehicle was searched for any contraband.  None was located. CI #1 was provided $100.00 in LPD Special Funds and an electronic audio/video recording device(s) which recorded the controlled purchase.

84.     CI #1 then left the PML and went to the TARGET PREMISES where CI #1 met FRIER in the front yard of the TARGET PREMISES. FRIER then begins to explain to CI #1 how to install the "switches" and that he already sold a Glock but he had another Glock 19 for sale.

85.     FRIER proceeded to explain that he has the AR "switches" too and that he can print (3D print) them. FRIER also stated that the "switches" should last approximately 10,000 rounds. FRIER stated the metal ones are being sold like "candy" that the "switches" will fit any Glock with the exception of a Glock 43 and continued to demonstrate to CI #1 how to install the "switch" and that it would convert it to fully automatic.

86.     CI #1 then left the TARGET PREMISES and returned to the PML where CI #1 turned over the evidence to ATF TFO Van Horn.  CI #1 and CI #1's vehicle were searched for any contraband.  None was located.  The evidence purchased is described as two blue in color Glock "switches" imprinted with "FGC."

**Controlled Purchase: #2 (Unregistered Machinegun and Privately Made Firearm)**

87.     On August 23, 2022, ATF TFO Van Horn along with other law enforcement personnel conducted a briefing at a PML in reference to CI #1 purchasing two Glock "switches" and two AR "switches" for $150.00 from FRIER at the TARGET PREMISES.

24

88.     CI #1 was provided $150.00 in LPD Special Funds and CI #1 and CI #1's vehicle were searched for any contraband. None was located. CI #1 was also provided an electronic audio/video recording device(s) that recorded the controlled purchase.

89.     CI #1 communicated with FRIER via Facebook Messenger.

90.     CI #1 arrived at the TARGET PREMISES and FRIER met CI #1 in the yard and he said that he hadn't made the AR piece yet but that he had the Glock one ready. FRIER then told CI #1 that if they would come back in approximately 30 minutes that FRIER could make another one. FRIER then advised that he had an AR for sale that shot AK rounds for $500.00 and that it was blue. FRIER stated that he could make them in blue, white, black, or red. FRIER then went inside of the residence and retrieved the Privately Made Firearm (PMF) and when he returns, he stated, "I made it myself."

91.     CI #1 then contacted ATF TFO Van Horn and advised that FRIER was attempting to sell the PMF for $500.00. FRIER then returned from inside of the TARGET PREMISES with a marijuana joint and a pink in color Glock "switch" and explained to CI #1 how to manipulate it for it to fit in the firearm. FRIER then states how the carbon fiber material is better to make the "switches" and that he purchased it from Amazon(.com). FRIER then states that he can get a "zip" (one ounce) of marijuana for $100.00. FRIER then asked CI #1 if they could sell "switches" in Charlotte, North Carolina.

92.     Later in conversation, FRIER told CI #1 that he purchased the 3D printer from Amazon(.com) for $400.00.

93.     FRIER also stated that he now lives at the TARGET PREMISES and that he has sold three .25 caliber firearms that week.

25

94.     CI #1 then left the TARGET PREMISES and returned to the PML. ATF TFO Van Horn provided additional Special Funds to CI #1 to purchase the PMF.

95.     CI #1 then returned to the TARGET PREMISES and FRIER gave CI #1 an AR and a Glock "switch" and then FRIER conducts a single test fire of the PMF in his back yard. CI #1 then provided FRIER with $650.00 of LPD Special Funds and requested ammunition for the PMF. FRIER then returns inside of the TARGET PREMISES and retrieves the ammunition. CI #1 then returns to the PML.

96.     Once at the PML, CI #1 and CI #1's vehicle were searched for contraband. None was located.

97.     The evidence purchased on August 8, 2022 and August 23, 2022 was as follows: (1) One pink in color Glock "switch" imprinted with "FGC"; (2) One pink in color AR "switch"; (3) One fully assembled blue in color PMF, with no make, model or serial number, chambered in 7.62x39; (4) One rear stock; (5) One AR style magazine removed from the PMF; (6) Two Tulammo bullets 7.62x39, one chambered in the PMF and one located in the magazine; and (7) nine additional Tulammo bullets 7.62x39.

### ATF Firearms Technology Criminal Branch

98.     On September 21, 2022, ATF Firearms Technology Criminal Branch received the four (4) "switches" from ATF TFO Van Horn, purchased from FRIER, to determine if they did in fact convert a semi-automatic firearm into a machine gun.

99.     On September 28, 2022, the ATF Firearms Technology Criminal Branch concluded its report and in summary, are the results below:

100.    Examination of Exhibit 1, a blue 3D printed polymer device that is dimensionally configured as a drop-in replacement part for the slide cover plate of a Glock-type pistol purchased from FRIER on August 8, 2022, is a MCD commonly referred to as a Glock Switch. Examination revealed no visible markings for NFA manufacturer or serial number on Exhibit 1. Exhibit 1 is designed to, and through demonstration, successfully converted the semiautomatic NFC Glock pistol into a machinegun; therefore, Exhibit 1 is a "machinegun" as defined.

101.    Examination of Exhibit 2, a blue 3D printed polymer device that is dimensionally configured as a drop-in replacement part for the slide cover plate of a Glock-type pistol purchased from FRIER on August 8, 2022, is a MCD commonly referred to as a Glock Switch. Examination revealed no visible markings for NFA manufacturer or serial number on Exhibit 2. Exhibit 2 is of nearly identical design and construction to Exhibit 1.  Exhibit 2 is designed to successfully converted the semiautomatic NFC Glock pistol into a machinegun; therefore, Exhibit 2 is a "machinegun" as defined.

102.    Examination of Exhibit 3, a pink 3D printed polymer device that is dimensionally configured as a drop-in replacement part for the slide cover plate of a Glock-type pistol purchased from FRIER on August 23, 2022, is a MCD commonly referred to as a Glock Switch. Examination revealed no visible markings for NFA manufacturer or serial number on Exhibit 3. Exhibit 3 is of nearly identical design and construction to Exhibit 1.  Exhibit 3 is designed to successfully converted the semiautomatic NFC Glock pistol into a machinegun; therefore, Exhibit 3 is a "machinegun" as defined.

103.    Examination of Exhibit 4, a pink 3D printed polymer device that is formed into a Trigger Control Group Travel Reducer (TCGTR) purchased from FRIER on August 23, 2022, is

designed to, and through demonstration, successfully converted the semiautomatic NFC Colt

rifle into a machinegun; therefore, Exhibit 4 is a "machinegun" as defined.

<u>**Controlled Purchase: #3 (Unregistered Machineguns and a Rifle)**</u>

104.    On May 02, 2023, ATF TFO B. McFadden along with additional law enforcement

personnel conducted a controlled purchase utilizing CI #2 to purchase five (5) Glock "switches"

from FRIER at the TARGET PREMISES.

105.    ATF TFO B. McFadden provided CI #2 with $1,200.00 in ATF Agent Cashier

Funds for the controlled purchase of evidence and also an audio/ video recording device(s).

106.    FRIER called CI #2 and told CI #2 to meet at the Hardee's located at 9760

Andrew Jackson Highway, Laurel Hill, NC 28351, to complete the controlled purchase.

107.    CI #2 utilized their personal vehicle to go to the location.

108.    Officers observed FRIER exit the driver's seat of a blue in color sedan, along with

two additional males, at Hardee's.

109.    Officers observed via transmitter FRIER hand CI #2 the Glock "switches."

FRIER then tells CI #2 that he has a "ARP" (AR Pistol) for sale for $500.00. CI #2 tells FRIER

that they want to purchase the "ARP" from FRIER.  CI #2 then tells FRIER that they will follow

behind FRIER.

110.    FRIER then left Hardees with the CI following and proceeded to the TARGET

PREMISES.  FRIER went inside the TARGET PREMISES and came back outside with the

firearm.  Officers then observe via transmitter, FRIER holding the firearm, then FRIER

proceeded to shoot the firearm one time and then handed the firearm to CI #2.  CI #2 then leaves

the PREMISES and returns to the PML.

28

111.     Once at the PML, CI #2 handed over the purchased evidence to ATF SA A.

Crumley.  The first purchase, located at Hardees, resulted in five (5) Glock "switches" for

$120.00.  The second purchase, located at the TARGET PREMISES, resulted in a Diamondback

Arms Rifle, Model DB-15, Serial Number DB-1807447 for $500.00.

112.     The distance from Hardee's, 9760 Andrew Jackson Highway, Laurel Hill, North

Carolina, 28351 to the TARGET PREMISES is approximately four (4) miles and takes

approximately seven (7) minutes to travel.

113.     The switches purchased on May 2, 2023 have been submitted to ATF's Firearms

Technology Criminal Branch, and the results are pending.  Because these switches are similar in

design and manufacture method as the switches previously confirmed as machineguns, it is

believed that these switches will be also be classified as machineguns.

114.     ATF Firearms Nexus Examiner SA J. Johnson, based upon his knowledge and

experience, concluded that the Diamondback Arms Rifle, Model DB-15, .223-caliber rifle, serial

number DB-1807447 is a firearm as defined in 18 U.S.C. § 921(a)(3).  It is the opinion of ATF

SA Johnson that the firearm was not manufactured in North Carolina and, thus, must have

traveled in, and thereby affect, interstate commerce, foreign commerce or both, if it was received

or possessed in North Carolina.

**Controlled Purchase: #4 (Unregistered Machinegun)**

115.     On May 25, 2023, ATF, with additional law enforcement personnel, conducted a

controlled purchase utilizing CI #3 to purchase one (1) Glock "switch" from FRIER at the

TARGET PREMISES.

116. CI #3 and CI #3's vehicle were searched prior to the controlled purchase with negative results. ATF SA Basgall provided CI #3 with $200 in ATF Agent Cashier Funds for the controlled purchase of evidence. The controlled purchase was audio and video recorded.

117. CI #3 placed a controlled call to FRIER via FaceTime audio to the email address of "frierkevin0@gmail.com."[5]

118. CI #3 utilized his/her personal vehicle to meet FRIER at the previously agreed upon location, the TARGET PREMISES.

119. Officers observed via direct line of sight CI #3 arrive at the TARGET PREMISES and meet with FRIER in the TARGET PREMISES's driveway. CI #3 was observed talking to FRIER through the open driver's side window of the vehicle.

120. Officers additionally observed, via transmitter, FRIER at CI #3's driver's side window holding an object in his hand which he exchanges with CI #3 for money.

121. Officers observed, via transmitter, CI #3 exits his/her vehicle and walk toward the TARGET PREMISES after being invited inside by FRIER to look at his marijuana plants. Officers again observe, via transmitter, FRIER open a closet door and show CI #3 two marijuana plants.

122. Officers observe, via transmitter, FRIER show CI # 3 FRIER's 3D printer which was black and silver in color. Behind the 3D printer were several spools of 3D printing filament.

---

[5] FaceTime audio calling is a cellphone application that allows the user to place phone calls via Wi-Fi signals in addition to cellular service. As such, no actual cellphone number is needed to place or receive a call, and email addresses can be used to send or receive calls.

123.    Officers observed via transmitter, CI #3 exit the residence and leave the TARGET

PREMISES. FRIER was observed entering a blue colored Chevrolet Aveo bearing North

Carolina License Plate, KFN-7181.[6] FRIER then left the TARGET PREMISES.

124.    Once at the PML, CI #3 relinquished the purchased evidence to ATF TFO Van

Horn. The fourth purchase, located at the TARGET PREMISES, resulted in one (1) Glock

"switch" being sold for $40.00. CI #3 and CI#3's vehicle were searched after the controlled

purchase with negative results.

125.    The switch purchased during the fourth controlled purchase has not yet been

submitted to the ATF's Firearms Technology Criminal Branch.  Because this switch is similar in

design and manufacture method as the switches previously confirmed as machineguns, it is

believed that this switch will be also be classified as a machinegun.

### Frier Has Not Complied with Federal Firearms Laws

126.    A query of ATF Federal Licensing System (FLS)[7] does not reveal FRIER

currently or has previously possessed a Federal Firearm License (FFL)[8].

--------

[6] A query of North Carolina Department of Motor Vehicles indicates that license plate number
KNF-7181 is registered to Kevin FRIER at the TARGET PREMISES.

[7] ATF Federal Licensing System (FLS) is ATF's computer-based system that can be
used to determine if someone is, or has been, a licensed federal firearms dealer and
to retrieve specific information relevant to current or former licensed dealers.

[8] A Federal Firearms Licensee is a person, partnership, or business entity holding a
valid license issued by ATF under the authority of 18 USC Chapter 44 that allows
them, or their employees, to "engage in the business" of dealing, manufacturing,
importing, or repairing firearms.

31

127.    A query of ATF National Firearms Registration and Transfer Registry (NFRTR)[9] did not reveal any National Firearms Act (NFA) weapons registered to FRIER.

## **GRAND JURY INDICTMENT**

128.    On May 30, 2023, a federal grand jury in the Middle District of North Carolina returned an Indictment charging FRIER with the following offenses in Case No. 1:23CR198-1:

a.    Count One: On or about August 8, 2022 in Scotland County, knowingly possessing firearms, that is, two auto sears, which constituted a part designed and intended for use in converting a firearm into a machinegun and which had not been registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871;

b.    Count Two: On or about August 23, 2022 in Scotland County, knowingly possessing firearms, that is, two auto sears, which constituted a part designed and intended for use in converting a firearm into a machinegun and which had not been registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871;

c.    Count Three: On or about May 2, 2023 in Scotland County, knowingly possessing firearms, that is, five auto sears, which constituted a part designed and intended for use in converting a firearm into a machinegun and which had not been

---

[9] The National Firearms Registration and Transfer Record (NFRTR) is an electronic database, maintained by ATF, of the National Firearms Act's (NFA's) regulated weapons possession and registration. The database is made up of data collected via the taxation and subsequent registration of NFA regulated firearms.

registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871; and

d. Count Four: On or about May 2, 2023 in Scotland County, knowingly possessing in and affecting commerce a firearm, that is, a Diamondback .223 caliber rifle, having been convicted of a crime punishable by imprisonment for a term exceeding one year, and with knowledge of that conviction.

## BACKGROUND ON 3-D PRINTERS AND 3-D MANUFACTURED OBJECTS

129.     I know, based on my training, research, and experience, that 3-D printing manufacturing tools include additive manufacturing tools (such as fused deposition modeling three dimensional printers (3-D Printers), fused filament fabrication 3-D printers, stereolithography, or digital light processing 3-D printers) and subtractive manufacturing tools (such as lathes, computerized numerical control (CNC) machines, mills, drill presses, and other similar items). A 3-D printer functions by extruding layers of heated plastic filament onto a flat surface and building, one layer at a time, a 3-dimensional object made of plastic material. I know that 3-D printers need instructions for how to build the 3-dimensional objects, and that these instructions are contained within files created by "slicer" software on a computer analyzing the digital file of a 3-D object. I know that these files are found on a variety of online websites and some files needed to print a firearm, firearm parts, machine conversion devices, etc. are free and some websites charge to download the file. I know that these instruction files and 3-D object files may be downloaded and stored on a computer, within the 3-D printer, or on a digital media storage device such as a flash drive, an SD card, a Micros SD card, external hard drive, or any other device capable of storing digital files including cellular phones and tablets. I know that in

33

order to print the 3-D image, the 3-D printer uses filament (plastic) in order to print the 3-D object. The filament is generally attached to the 3-D printer via a spool on the 3-D printer. I know that 3-D printers can be bought in a variety of sizes. 3-D printing consumable materials include filament, resins, nozzles, scrapers, and other items used in the production, finishing, and removal of 3-D manufactured objects.

130. I know that individuals who manufacture PMFs from commercially purchased Polymer 80 firearm kits often times will use a jig, tools such as a drill press, drill, drill bits, file, rotary tool and various bits to complete the 80% lower receiver into a completed firearm. I know that individuals that manufacture PMFs will generally have firearms parts needed to complete the firearm to include but not limited to slide, barrel, slide parts kit, rail kits, and trigger assembly/lower parts kits. The below image is of a 3-D printer viewed on May 23, 2023, while doing additional research of 3-D printers and is one example of many varieties of 3-D printers.



SD Card

Filament (plastic)

## BACKGROUND CONCERNING FIREARMS TRAFFICKING

131.    Based on my training, experience, and participation in firearms trafficking investigations, and my knowledge of this case, I know that:

   a.   Firearms traffickers often maintain books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of firearms, even though such documents may be in code. That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where firearms traffickers have ready access to them, including but not limited to residences, offices, vehicles, cell phones, electronic storing devices and storage facilities;

   b.   Firearms traffickers commonly maintain addresses and telephone numbers in books, papers, and electronic data storage devices which reflect names, addresses,

35

and/or telephone numbers for their associates in the firearms trafficking organization;

c.    Firearms traffickers commonly utilize telephones, both residential and cellular, as a means of communications to conduct their trafficking business;

d.    Firearms traffickers often maintain, on hand, large amounts of U.S. Currency in order to maintain and finance their ongoing trafficking business, or as proceeds including in this case the possibility of FRIER still having pre-recorded buy money.

e.    Firearms traffickers frequently take photographs/videos of themselves, their co-conspirators, their property, their firearms; and these traffickers usually maintain these photographs/videos in their residences, offices, and other places under their control;

f.    Firearms traffickers often purchase expensive vehicles, businesses, and residences with the proceeds from their illicit transactions, and they often keep these items registered in the names of other individuals in order to avoid discovery by law enforcement;

g.    Firearms traffickers commonly possess/deal firearms in exchange for other illegal contraband, and these firearms/ammunition are used by firearms traffickers as an item of investment, intimidation, and for protection from robberies by other traffickers or customers;

h.    Individuals involved in firearms trafficking often use computer equipment to document and track their business affairs;

i.    Firearms traffickers often secure contraband, proceeds of firearms trafficking sales,

36

and records of transactions, firearm sources, and customers in secure locations within residences, sheds, businesses, garages, storage buildings, safes, safe deposit boxes, and vehicles in order to conceal such items from law enforcement;

j.  The courts have recognized that unexplained wealth is evidence of a crime motivated by greed, in particular, trafficking firearms;

k.  Firearms trafficking is a continuing activity over months and even years. Traffickers will have an inventory, which will fluctuate in size, depending on demand for the product. Traffickers will keep records of their illegal activities, for example, a ledger to show money owed to them and owed to others, for months or years beyond the time during which they actually possess illegal contraband, in order to maintain contact with their criminal co-conspirators and associates for future transactions.

## BACKGROUND CONCERNING CELLULAR DEVICES, COMPUTERS, AND STORAGE MEDIA

43.  I know that cellular telephones are important to a criminal investigation because cellular telephones may be evidence or instrumentalities of crime, and/or may be used as storage devices that contain evidence of crimes in the form of electronic data. In this case, the warrant application requests permission to search and seize records relating to the trafficking of the substances identified in this investigation. These records constitute evidence of crime. I also request permission to seize the cellular telephones that may contain these records and search the memory of the cellular telephones. I believe that, in this case, cellular telephones (including saved voice mails, data files, photo and video files, and text messages) are a container for evidence and instrumentalities of the crimes under investigation.

37

44.    Moreover, I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, as well as other brands of cellular phones, that some models of Apple devices such as iPhones and iPads, as well as other brands of cell phones, offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID. Further, some devices offer the users to ability to unlock the device via the use of facial recognition. This feature is called Face ID. If a user enables Touch ID and/or Face ID on a given cellular device, he or she can register multiple fingerprints and/or facial recognition that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device.

45.    In my training and experience, users of cellular devices that offer Touch ID and/or Face ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device. In some circumstances, a fingerprint and/or facial recognition cannot be used to unlock a device that has Touch/Face ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch/Face ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement

encounters a locked cellular device, the opportunity to unlock the device via Touch/Face ID exists only for a short time. Touch/Face ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch/Face ID are made.

46. The passcode or password that would unlock the cellular device(s) found during the search of the Subject Premises is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) and/or scan the face(s) (utilizing the cellular device(s)) of the user(s) of the cellular device(s) found during the search of the Subject Premises to the device's Touch/Face ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant cellular device(s) via Touch/Face ID with the use of the fingerprints/facial scan of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

47. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints/facial recognition are among those that will unlock the device via Touch/Face ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any

occupant of the Subject Premises to press their finger(s) against the Touch ID sensor of the locked

cellular device(s) found during the search of the Subject Premises in order to attempt to identify

the device's user(s) and unlock the device(s) via Touch ID.

48.     Although I do not know which of a given user's 10 fingerprints is capable of

unlocking a particular device, based on my training and experience I know that it is common for a

user to unlock a Touch ID-enabled device via the fingerprints on thumbs or index fingers.  In the

event that law enforcement is unable to unlock the cellular device(s) found in the Subject Premises

as described above within the five attempts permitted by Touch ID, this will simply result in the

device requiring the entry of a password or passcode before it can be unlocked.

49.     Due to the foregoing, I request that the Court authorize law enforcement to press

the fingers (including thumbs) of individuals found at the Subject Premises to the Touch ID sensor

of the cellular device(s), such as an iPhone or iPad, found at the Subject Premises for the purpose

of attempting to unlock the device via Touch ID in order to search the contents as authorized by

this warrant.  I further request the Court authorize law enforcement to conduct facial scans of

individuals found at the Subject Premises utilizing the Face ID sensor of the cellular device(s),

such as an iPhone or iPad, found at the Subject Premises for the purpose of attempting to unlock

the device via Face ID in order to search the contents authorized by this warrant.

50.     Furthermore, as described above and in Attachment B, this application seeks

permission to search for evidence that might be found on the TARGET PREMISES, and on the

person of Kevin Ray FRIER, in whatever form it is found.  One form in which the records might

be found is data stored on a computer's hard drive or other storage media, such as SD cards, micro-

SD cards, thumb drives, external hard drives.  Thus, the warrant applied for would authorize the

seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

51.     I submit that if a computer or storage medium is found at the TARGET PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium. I submit that if a mobile device is found at the TARGET PREMISES, or on the person of Kevin Ray FRIER, there is probable cause to believe the records referenced above will be stored on that mobile device.  There is probable cause for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer

41

has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

52. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only elctronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers, cellular telephones, tablets, thumb drives, SD cards, external hard drives etc., were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers,

42

e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

43

c. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

d. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.

e. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and

44

intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

f.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

g.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

h.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

45

53.     *Necessity of seizing or copying entire computers or storage media or cellular phone.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   a.  <u>The time required for an examination</u>. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

   b.  <u>Technical requirements</u>. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge

46

that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c. <u>Variety of forms of electronic media</u>. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

    54. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

47

## CONCLUSION

55.     Based on the foregoing, I submit there is probable cause to believe that KEVIN RAY FRIER has committed the TARGET OFFENSES, and that evidence pertaining to those violations will be found in the TARGET PREMISES.

56.     Your affiant submits that this affidavit supports probable cause for a warrant to search the TARGET PREMISES, described in Attachment A, and KEVIN RAY FRIER and seize the items described in Attachment B.

Respectfully Submitted,

/s/A. Warren
Austin Warren
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

On this day, the applicant appeared before me by reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.   June 6, 2023, 2:39 pm

The Hon. Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

48

## ATTACHMENT A

## PREMISES AND PERSON TO BE SEARCHED

1.     The TARGET PREMISES is located at 15300 Fork Street, Laurel Hill, North Carolina, 28351, and is a single wide trailer.  The residence is tan with a multi-step deck/front porch leading to the front door.  The front porch/deck is made of wood. The trailer is trimmed in a red/burgundy color. There is tin metal underpinning of the trailer.  There is a window A/C unit in the window facing Fork Street. FRIER's passenger car is generally parked in the driveway.



2.     The person to be searched is:  KEVIN RAY FRIER (DOB: 09/13/1999) with NC

DMV image:



50

## ATTACHMENT B

### ITEMS TO BE SEIZED

All items constituting evidence and/or instrumentalities of violations involving firearms trafficking in violation of Title 18, United States Code, Section 922(a)(1)(A) - Manufacturing and Dealing Firearms Without a License; Title 18, United States Code, Section 922 (o) – Possession of a Machinegun; Title 26, United States Code, Section 5861(d) and (f) – Making and/or possessing a firearm(s) (machineguns) in violation of the NFA; and Title 18, United States Code, Section 933 – Firearms Trafficking, and Title 18, United States Code, Section 922 (g) – Felon in Possession of a Firearm (TARGET OFFENSES), in the form of the following:

1.     Firearms, including, but not limited to, firearms parts, accessories, firearm-making tools, holsters, machineguns, machine gun conversion devices, and ammunition.

2.     Indicia of distribution, records and documents, receipts, notes ledgers and other papers including any documents relating to the ordering, purchase or possession of firearms and/or firearm-related parts;

3.     Any electronic devices, including cell phones, tablets, computer, 3-D printers, SD cards, thumb drives, micro-SD cards, external hard drives or any other type of digital media storage device that could contain files and programs utilized in the 3-D printing process, or in the manufacture, facilitation, and distribution of machineguns, whether found in the TARGET PREMISES or on FRIER.

3.     For any electronic device whose seizure and subsequent search is otherwise authorized by this warrant:

   a.  evidence of who used, owned, or controlled the mobile device at the time the things described in this warrant were created, edited, deleted, viewed, or otherwise interacted with;

   b.  evidence of how and when the mobile device was used to create, edit, delete, view, or otherwise interact with or engage in the things described in this warrant;

   c.  passwords, encryption keys, and other access devices that may be necessary to access the mobile device;

   d.  evidence of software that would allow others to control the mobile device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   e.  evidence of programs (and associated data) that are designed to eliminate data from the mobile device;

4.     During the execution of the search of the TARGET PREMISES and FRIER described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of FRIER, provided FRIER is reasonably believed by law enforcement to be a user of a device, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face of FRIER to activate the facial recognition feature or the device's iris recognition feature, for the purpose of unlocking the device(s) in order to search the contents as authorized by this warrant.

5.     U.S. currency and other illicit gains from the distribution of firearms;

6.     Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records relating to the ordering, purchase, sale, or possession of firearms;

2

7.     Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

8.     Documents and papers evidencing ownership of firearms, possession of firearms, sales of firearms, storage and location of such assets and facilities to safely store and secure such items, such as safes, to include lock boxes, gun safes, and strong boxes; and authorizing the manual opening of any locked safe if no key or combination is located;

9.     Photographs, in particular, photographs of firearms, firearms parts, machineguns, conversion devices, and photographs of individuals possessing firearms and photographs showing the association of individuals;

10.     Indicia of occupancy, residence, and/or ownership of the TARGET PREMISES described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

11.     3-D printers, software manufacturing tools such as additive manufacturing tools, Fused Deposition Modeling Three Dimensional Printers (3-D Printers), Fused Filament Fabrication 3-D Printers, Stereolithography or Digital Light Processing 3-D printers, subtractive manufacturing tools such as Lathes, Computerized Numerical Control (CNC) machines, Mills, Drill presses, and other similar items;

    a.   Tools used in the additive or subtractive production of 3-D-printed items;

    b.   Materials consumed by 3-D printing machines, such as filaments, resins, nozzles, scrapers, and other items used in the production, finishing, and removal of 3-D manufactured objects;

    c.   Computerized control devices, such as memory storage devices, micro/mini-computers, print servers, and other devices used in the transmission of data during

3

the 3-D manufacturing process, thumb drives, SD cards, micro-SD cards, external hard drives; and

d.  Books, training manuals, designs, patterns, instructions, or other media, physical or digital, related to the manufacturing, printing, or production of firearms as it pertains to the above-mentioned offenses.

e.  Packaging or shipping materials related to 3-D printers, accessories, filament, and any other 3-D printing related materials.

f.  As used above, the terms records, documents, programs, applications or materials includes records, documents, programs, applications or materials created, modified or stored in any form.

4